2016 CO 5

**Merridy Kay BAKER and Sue Carol Kunda, Petitioners,**

v.

**WOOD, RIS & HAMES, PROFESSIONAL CORPORATION, a Colorado professional corporation; Donald L. Cook; and Barbara L. Brundin, Respondents.**

**Supreme Court Case No. 13SC554**

Supreme Court of Colorado.

January 19, 2016

Rehearing Denied February 8, 2016

Attorneys for Petitioners: Stinson Leonard Street LLP, William C. Waller, Jr., Reid A. Page, Dylan H. Metzner, Greenwood Village, Colorado, Denis H. Mark, P.C., Denis H. Mark, Greenwood Village, Colorado.

Attorneys for Respondents: Wheeler Trigg O'Donnell LLP, Michael L. O'Donnell, Carolyn J. Fairless, Kendra N. Beckwith, Denver, Colorado.

Attorneys for Amicus Curiae Colorado Bar Association: MiletichCohen, PC, Nancy L. Cohen, Lauren H. Lantero, Denver, Colorado, Montgomery Little & Soran, PC, Christopher B. Little, Greenwood Village, Colorado.

JUSTICE GABRIEL delivered the Opinion of the Court.

¶ 1 This case principally requires us to decide whether dissatisfied beneficiaries of a testator's estate have standing to bring legal malpractice or contract claims against the attorney who drafted the testator's estate planning documents.[1] Specifically, petitioners Merridy Kay Baker and Sue Carol Kunda seek to bring malpractice and contract claims against respondents Wood, Ris & Hames, Professional Corporation, Donald L. Cook, and Barbara L. Brundin (collectively, the Attorneys), who were the attorneys retained by their father, Floyd Baker, to prepare his estate plan. Baker and Kunda ask us to abandon what has come to be called the "strict privity rule," which precludes attorney liability to non-clients absent fraud, malicious conduct, or negligent misrepresentation. They advocate instead for the so-called "California Test" and for an extension of the third-party beneficiary theory of contract lia-

bility frequently called the "Florida–Iowa Rule," both of which they assert would allow them, as alleged intended beneficiaries of Floyd's estate, to sue the Attorneys for legal malpractice and breach of contract.

¶ 2 We decline to abandon the strict privity rule, and we reaffirm that where non-clients like Baker and Kunda are concerned, an attorney's liability is generally limited to the narrow set of circumstances in which the attorney has committed fraud or a malicious or tortious act, including negligent misrepresentation.

¶ 3 We further reject Baker and Kunda's contention that the division of the court of appeals erred in affirming the dismissal of their purported fraudulent concealment claims.

¶ 4 Accordingly, we affirm the judgment of the court of appeals.

## I. Facts and Procedural History

¶ 5 Baker and Kunda were Floyd Baker's children and the stepchildren of Floyd's wife, Betty Baker. Betty had two children by a prior marriage, Paula B. Roosa and Robert F. Brown.

¶ 6 Floyd retained the Attorneys to prepare his estate plan, and based on the Attorneys' advice, he decided to use a will and testamentary trusts to govern the dispositive terms of that plan. Floyd's will provided that on his death, each of the four children would receive a $10,000 distribution, and Betty would receive Floyd's condominium. The will further provided that the residue of Floyd's estate would be divided between a marital testamentary trust and a family testamentary trust. Betty was designated as the trustee and beneficiary of both of these trusts, with the right to receive principal and

---

1. We granted certiorari to review the following issues:

 1. Whether the court of appeals erred in determining that third-party intended beneficiaries of a deceased testator's estate plan lack standing to pursue a claim for professional malpractice against the testator's estate planning attorneys based on either breach of contract or professional negligence.

2. Whether the court of appeals erred in confusing petitioners' claim for fraudulent concealment with the distinct tort of fraudulent misrepresentation in applying the heightened pleading requirements of C.R.C.P. 9(b) to petitioners' concealment claim as if it were a claim for fraudulent misrepresentation.

income derived from the assets of each trust. On Betty's death, the remaining trust assets would be divided equally among the four children.

¶ 7 Floyd died in 2003, survived by Betty and all four children. Before his death, certain of his assets were held in joint tenancy with Betty. Accordingly, when Floyd died, these assets passed directly to Betty as the surviving joint tenant. In addition, on Floyd's death, each child received his or her $10,000 testamentary bequest, and the family and marital trusts were both funded, with the family trust receiving assets worth approximately $929,000 and the marital trust receiving approximately $64,000.

¶ 8 Thereafter, Baker and Kunda contacted respondent Wood, Ris & Hames to seek assurances as to the proper funding and administration of Floyd's trusts. On November 19, 2003, respondent Brundin answered in writing on behalf of the firm. Brundin's letter attached a copy of Floyd's will and explained the $10,000 bequests to each of the children. The letter further described the creation, funding, and general operation of the family trust. And Brundin wrote, "Please understand that I represent Betty Baker as the Personal Representative of Mr. Baker's estate only and I cannot represent either of you individually. If you feel you need an attorney to review the Will to become familiar with the positions [sic]; I encourage you to do so."

¶ 9 Subsequently, Betty, in her individual capacity, retained respondent Cook to prepare her own estate plan. Betty executed her last will and testament in November 2004, and she signed two codicils thereafter. She died in February 2009, survived by Roosa, Baker, and Kunda.

¶ 10 Pursuant to Betty's will, the condominium that she owned was devised to Roosa, and the residue of her estate was to be divided among Roosa, Baker, and Kunda. Baker and Kunda allege that the distribution of probate and non-probate assets following Betty's death resulted in Roosa's receiving seventy percent of Betty's assets, while Baker and Kunda received only fifteen percent each. They further allege that after Betty's death, Roosa was anticipated to receive approximately $3.2 million in assets from Floyd's will and Betty's will, while they would receive approximately $962,000 each.

¶ 11 Baker and Kunda subsequently sued the Attorneys, asserting claims for, among other things, (1) breach of contract—third-party beneficiary, (2) professional negligence, and (3) fraudulent concealment and negligent misrepresentation. In support of these claims, Baker and Kunda alleged that the Attorneys had failed to advise Floyd of the impact of joint tenancy and that titling assets in joint tenancy and failing to sever joint tenancy properties would frustrate his intent to treat the children equally. Specifically, they alleged that (1) the Attorneys' negligence allowed Betty to override Floyd's estate plan after his death; (2) the Attorneys had drafted an estate plan for Betty that controverted Floyd's plan; and (3) Baker and Kunda were the intended beneficiaries of Floyd's will, the Attorneys had failed to advise them of the above-noted facts, and they suffered damages as a result of the Attorneys' actions and inactions.

¶ 12 The Attorneys moved to dismiss the complaint for failure to state a claim on which relief could be granted. As pertinent here, they asserted that Baker and Kunda lacked standing to sue them and that even if Baker and Kunda had standing, their claims failed because Floyd's intent had to be gleaned from his will itself, and the will was unambiguous and did not evince the intent alleged by Baker and Kunda. The Attorneys further argued that all of Baker and Kunda's claims were time-barred.

¶ 13 The district court ultimately granted the Attorneys' motion. As pertinent here, the court dismissed Baker and Kunda's contract claim, concluding that Baker and Kunda had not alleged sufficient facts to show that Floyd's testamentary intent was subverted. The court further concluded that Baker and Kunda had not alleged sufficient facts to support their fraudulent concealment and negligent misrepresentation claims. Regarding the fraudulent concealment claim, the court found that Baker and Kunda had not sufficiently alleged that any of the purportedly concealed facts had actually been

concealed or that the Attorneys had intended for Baker and Kunda to rely on the allegedly misrepresented circumstances. As for the negligent misrepresentation claim, the court observed that under *Allen v. Steele*, 252 P.3d 476, 484 (Colo.2011), such a claim required a business transaction, and the present case involved no such transaction. Finally, with respect to Baker and Kunda's legal malpractice claim, the court concluded that Baker and Kunda had failed to establish that the Attorneys owed them a duty of care that would give rise to liability.

¶ 14 Baker and Kunda appealed, contending that the district court had erred in dismissing their claims. As pertinent here, they asked the division to recognize an exception to the strict privity rule for third-party intended beneficiaries of a will. Alternatively, they asserted that even if the strict privity rule applied, they had stated viable claims under its exceptions for fraud, malicious conduct, and negligent misrepresentation.

¶ 15 The division declined to recognize an exception to the strict privity rule that would have extended attorney contractual liability to non-clients, and thus, the division affirmed the dismissal of Baker and Kunda's contract claims. In addition, although the division acknowledged that under Colorado's strict privity rule, non-clients could sue an attorney for fraud and negligent misrepresentation, the division nonetheless affirmed the dismissal of Baker and Kunda's fraudulent concealment and negligent misrepresentation claims. Specifically, the division concluded that Baker and Kunda had not pleaded those claims with the particularity mandated by C.R.C.P. 9(b) and had not shown that they were engaged in a business transaction with the Attorneys, as required to support a negligent misrepresentation claim. Finally, and consistent with its above-described conclusions, the division affirmed the dismissal of Baker and Kunda's professional malpractice claim, concluding that under Colorado law, the Attorneys owed them no duty unless one of the exceptions (i.e., for fraud, malicious conduct, or negligent misrepresentation) applied, and

Baker and Kunda had not alleged sufficient facts to state a claim under any of those exceptions.

¶ 16 We subsequently granted Baker and Kunda's petition for certiorari.

## II. Analysis

¶ 17 Baker and Kunda contend that the district court erred in dismissing their claims because (1) as alleged intended third-party beneficiaries of Floyd's estate, they have standing to sue the Attorneys for legal malpractice and breach of contract; and (2) the division below misconstrued their fraudulent concealment claims and incorrectly applied a heightened pleading standard to those claims.[2] We are not persuaded.

### A. Standing

■ ¶ 18 Baker and Kunda acknowledge that, historically, courts have adhered to the strict privity rule in determining whether a non-client may sue an attorney. They urge us to abandon that rule, however, and to adopt both the California Test and the Florida–Iowa Rule, which would allow them to assert legal malpractice and contract claims against the Attorneys, notwithstanding the absence of privity. On the facts alleged here, we decline to do so.

¶ 19 We first describe the strict privity rule and the policies underlying that rule. We then proceed to address the California Test and the Florida–Iowa Rule. We decline to adopt either here, and we further conclude that even if these standards were the law in this state, they would not save Baker and Kunda's malpractice and contract claims against the Attorneys. We conclude by addressing the policy arguments advanced by Baker and Kunda to support their alleged standing to assert such claims.

### 1. Strict Privity

■ ¶ 20 As this court has recognized, "[t]he attorney-client relationship is distinctly a fiduciary relationship arising as a matter of law and founded upon a special trust and confidence." *Accident & Injury Med. Spe-*

---

**2.** Baker and Kunda have not renewed before us their arguments below regarding their negligent

misrepresentation claims. Accordingly, we do not address those claims.

*cialists, P.C. v. Mintz,* 2012 CO 50, ¶ 25, 279 P.3d 658, 663. In light of this relationship, an attorney's obligation is generally to his or her client and not to a third party. *Sav. Bank v. Ward,* 100 U.S. 195, 200, 25 L.Ed. 621 (1879); *see also Allen,* 252 P.3d at 482 (noting that attorneys generally do not owe duties of reasonable care to non-clients and that subject to limited exceptions, "[a]n attorney may be liable for legal malpractice only if the plaintiff has proven the existence of an attorney-client relationship"); *Chem–Age Indus., Inc. v. Glover,* 652 N.W.2d 756, 770 (S.D.2002) (noting that because trust and confidence between an attorney and his or her client are essential, the attorney-client relationship requires greater protection from third-party claims than do nonconfidential relationships).

¶ 21 Accordingly, we have concluded that "[w]here non-clients are concerned, an attorney's liability is generally limited to a narrow set of circumstances in which the attorney has committed fraud or a malicious or tortious act, including negligent misrepresentation." *Allen,* 252 P.3d at 482; *see also id.* at 484 ("[T]o state a claim of negligent misrepresentation, the misrepresentation must be given for the plaintiff's business or commercial purposes.").

¶ 22 This court, divisions of our court of appeals, and our sister courts have recognized several sound policy reasons justifying this limitation on attorney liability.

██ ¶ 23 First, limiting an attorney's liability to his or her clients protects the attorney's duty of loyalty to and effective advocacy for the client. *See, e.g., Mintz,* ¶ 26, 279 P.3d at 663–64; *Glover v. Southard,* 894 P.2d 21, 23 (Colo.App.1994); *Shoemaker v. Gindlesberger,* 118 Ohio St.3d 226, 887 N.E.2d 1167, 1171 (2008); *Chem–Age Indus., Inc.,* 652 N.W.2d at 769; *Barcelo v. Elliott,* 923 S.W.2d 575, 578 (Tex.1996). As the Maryland Court of Appeals explained in *Noble v. Bruce,* 349 Md. 730, 709 A.2d 1264, 1270 (1998) (citations omitted) (quoting *Lewis v. Star Bank, N.A.,* 90 Ohio App.3d 709, 630 N.E.2d 418, 421 (1993)):

> While the testator/client is alive, the lawyer owes him or her a "duty of complete and undivided loyalty." The strict privity

rule protects an attorney's obligation to direct his or her full attention to the needs of the client. An attorney's preoccupation or concern with potential negligence claims by third parties might result in a diminution in the quality of the legal services received by the client as the attorney might weigh the client's interests against the attorney's fear of liability to a third party.

Such a result, in turn, would tend to undermine the purpose of the attorney-client relationship, which requires that an attorney act in his or her client's best interest. *Glover,* 894 P.2d at 23.

¶ 24 Second, expanding attorney liability to non-clients could result in adversarial relationships between an attorney and third parties and thus give rise to conflicting duties on the part of the attorney. *See, e.g., Mintz,* ¶ 26, 279 P.3d at 663–64; *Glover,* 894 P.2d at 23; *see also Noble,* 709 A.2d at 1270 ("[T]here exists the danger of placing conflicting duties on an attorney during the estate planning process if a nonclient is permitted to maintain a cause of action against a testator's attorney."); *Barcelo,* 923 S.W.2d at 578 (recognizing a conflict of interest when a beneficiary sues the testator's attorney for negligence because the alleged deficiencies may well have existed pursuant to instructions issued by the testator after receiving the advice of counsel). Such conflicting duties and loyalties, in turn, could constrain the attorney's ability to represent his or her client properly. *See Blair v. Ing,* 95 Hawai'i 247, 21 P.3d 452, 459 (2001); *see also Barcelo,* 923 S.W.2d at 578 (noting that an attorney's ability to render advice would be severely compromised if the advice could be second-guessed in the future by disappointed beneficiaries).

¶ 25 Moreover, "[a]llowing a nonclient beneficiary to maintain a cause of action against an attorney for professional malpractice may require the attorney to reveal confidences the testator would never want revealed." *Noble,* 709 A.2d at 1278. By way of example, the court in *Noble* envisioned a scenario in which the testator tells a relative that he or she will inherit part of the testator's estate, but, in reality, the testator does not intend to

leave anything to this relative because the testator secretly believes that the relative is an evil person. *Id.* If the testator confides this secret belief to his or her attorney and requests that the attorney draft a will leaving nothing to the relative, and if the relative has standing after the testator's death to sue the attorney for malpractice, then the attorney may be forced to reveal confidences that the testator never would have wanted to be revealed. *Id.*

¶ 26 Third, if an attorney's duty of care were extended to third parties, then the attorney could be liable to an unforeseeable and unlimited number of people. *See, e.g., Mintz,* ¶ 26, 279 P.3d at 663; *Allen,* 252 P.3d at 482; *accord Robinson v. Benton,* 842 So.2d 631, 637 (Ala.2002); *Chem–Age Indus., Inc.,* 652 N.W.2d at 769. Thus, as the Supreme Court stated in *Ward,* 100 U.S. at 202, requiring strict privity "is plainly necessary to restrain the remedy from being pushed to an impracticable extreme." *See also id.* at 203 ("The only safe rule is to confine the right to recover to those who enter into the contract; if we go one step beyond that, there is no reason why we should not go fifty.").

¶ 27 The impact of an expansion of attorney liability to third parties would not be limited to the attorneys. As other courts have recognized, an expansion of attorney liability to allow claims by non-clients could deter attorneys from undertaking certain legal matters, thus compromising the interests of potential clients by making it more difficult for them to obtain legal services. *See Chem–Age Indus., Inc.,* 652 N.W.2d at 770; *see also Noble,* 709 A.2d at 1270 (noting that an attorney's preoccupation or concern with potential liability to non-parties might result in a diminution in the quality of legal services provided because the attorney would need to weigh the client's interests against his or her liability risk). As important, in such an environment, the testator/client could potentially lose control over his or her contract for legal services. *See Noble,* 709 A.2d at 1270.

¶ 28 Finally, extending attorney liability to non-client beneficiaries risks suits by disappointed beneficiaries that would cast doubt on the testator's intentions long after the testator is deceased and unavailable to speak for himself or herself. *See Blair,* 21 P.3d at 459. Such a result would be contrary to the "cardinal rule in the interpretation of wills' or other testamentary documents," namely, that "the testator's intent should be ascertained from the instrument itself and given effect." *In re Estate of McCreath,* 240 P.3d 413, 422–23 (Colo.App.2009). Allowing disappointed beneficiaries to question a deceased testator's intentions would also contradict the policy underlying Colorado's dead man's statute, § 13–90–102, C.R.S. (2015). That statute limits the admissibility of statements made by persons who are incapable of testifying, *see id.* and thereby seeks "to guard against perjury by living interested witnesses when deceased persons cannot refute the testimony, thus protecting estates against unjust claims," *In re Estate of Crenshaw,* 100 P.3d 568, 569 (Colo.App.2004).

## 2. The California Rule

¶ 29 Notwithstanding the foregoing settled and substantial policies favoring privity as a prerequisite to attorney liability to non-clients, Baker and Kunda urge this court to expand attorney liability to non-clients by adopting the so-called "California Test," which was first articulated in *Lucas v. Hamm,* 56 Cal.2d 583, 15 Cal.Rptr. 821, 364 P.2d 685, 687 (1961). In that case, the California Supreme Court established the following approach for determining whether a beneficiary of an estate is entitled to bring an action against a testator's attorney for negligence in the drafting of a will:

[T]he determination whether in a specific case the defendant will be held liable to a third person not in privity is a matter of policy and involves the balancing of various factors, among which are the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury, and the policy of preventing future harm.

¶ 30 Although Baker and Kunda contend that the factors enunciated in the California Test mirror the factors previously identified

by this court, in our view, the California Test is *in*consistent with the above-described policies favoring a privity requirement. Moreover, even if it were the law in this state, the California Test would not support the claims that Baker and Kunda seek to assert here. We address each of these points in turn.

¶ 31 As to Baker and Kunda's assertion that the California Test is consistent with the above-described policies favoring a privity requirement, contrary to those policies, the California Test allows non-clients to file lawsuits, after the testator is gone and unable to speak for himself or herself, in which the non-clients may, and often do, question the testator's intent. For the reasons set forth above, allowing non-clients to do so threatens the attorney's duty of loyalty to and effective advocacy for his or her client. Moreover, allowing such claims to proceed exposes an attorney to liability to an unlimited number of unforeseeable parties because virtually any disappointed beneficiary could appear and allege that (1) the testator intended a bequest to him or her, (2) the attorney's failure to include the bequest caused harm, and (3) allowing the disappointed beneficiary to pursue a claim against the attorney would prevent future harm.

¶ 32 Recognizing the importance of the above-described policies for limiting attorney liability to non-clients, divisions of the court of appeals, like the division in this case, have consistently declined to expand attorney liability to non-clients.

¶ 33 For example, in *Shriners Hospital for Crippled Children, Inc. v. Southard*, 892 P.2d 417, 418–19 (Colo.App.1994), the division rejected the plaintiff's argument that a third party had standing to bring an action for attorney malpractice if the third party was an intended beneficiary of the client's will. In reaching this conclusion, the division observed that an attorney has a duty to act in the client's best interests and is liable to third parties only for injuries caused by, among other things, the attorney's fraudulent or malicious conduct. *Id.* at 418. The division then noted the policies discussed above and distinguished the out-of-state cases on which the plaintiff had relied, reasoning that those cases involved situations in which a beneficiary did not receive what the testator expressly intended because of the attorney's poor draftsmanship or failure to follow through to achieve the testator's desired result. *Id.* at 418–19.

¶ 34 In *Glover*, 894 P.2d at 23–25, the division applied the same analysis and relied on the same policy considerations in rejecting the plaintiffs' contention that they had standing as third parties to sue an attorney for malpractice because they were the intended beneficiaries of an allegedly negligently drafted testamentary instrument. As a matter of public policy, the division concluded that

> it is in the public's best interest to protect attorneys from potentially unlimited liability to third parties whose interests may interfere with the attorney's ability to fulfill the duties of undivided loyalty and advocacy owed to his or her client. Thus, in drafting testamentary instruments at the behest of a client, an attorney should not be burdened with potential liability to possible beneficiaries of such instruments.

*Id.* at 24–25 (citation omitted).

¶ 35 We agree with these prior divisions of the court of appeals and reiterate that in Colorado, an attorney's liability to a nonclient is limited to the narrow set of circumstances in which the attorney has committed fraud or a malicious or tortious act, including negligent misrepresentation. *See Allen*, 252 P.3d at 482. In reaching this conclusion, we acknowledge that courts in some jurisdictions have allowed disappointed third-party beneficiaries to sue a testator's attorney, notwithstanding the absence of an attorney-client relationship. Nonetheless, we believe that the strict privity rule (with its limited exceptions) better protects the sanctity of and duties and protections inherent in the attorney-client relationship. We further believe that the strict privity rule strikes the appropriate balance between the important interests of clients, on the one hand, and nonclients claiming to be injured by an attorney's conduct, on the other.

¶ 36 Our conclusion finds further support in the Colorado Probate Code, which provides a means by which disappointed benefi-

ciaries can litigate what they perceive to be the testator's true intent. Specifically, section 15-11-806, C.R.S. (2015), allows a court to

> reform the terms of a governing instrument, even if unambiguous, to conform the terms to the transferor's intention if it is proved by clear and convincing evidence that the transferor's intent and the terms of the governing instrument were affected by a mistake of fact or law, whether in expression or inducement.

¶ 37 Accordingly, notwithstanding Baker and Kunda's assertion to the contrary, disappointed beneficiaries like them are not without a viable remedy absent claims against the testator's attorney. *Cf. In re Estate of Johnson*, 2012 COA 209, ¶ 22, 304 P.3d 614, 618 (implicitly recognizing that a disappointed beneficiary has standing to bring a reformation claim under section 15-11-806 but concluding on the facts presented that the petitioner lacked standing because she had been removed as a beneficiary of the instrument at issue).

¶ 38 Even if the California Test were the law in this state, however, it would not support the claims that Baker and Kunda seek to assert here.

¶ 39 In *Lucas*, 15 Cal.Rptr. 821, 364 P.2d at 686-87, it was undisputed that the testator intended to name the plaintiffs as beneficiaries of a trust and that the attorney drafted a residual trust provision that sought to effectuate that intent but that was held to be invalid based on statutes relating to restraints on alienation and the rule against perpetuities. As a result, the plaintiffs were deprived of the distributions that the testator expressly sought to provide them because of the attorney's negligence in drafting a legally invalid trust provision. *Id.*, 15 Cal.Rptr. 821, 364 P.2d at 687.

¶ 40 Accordingly, contrary to Baker and Kunda's broad interpretation, *Lucas* was limited to the scenario in which the testator's intent was clear on the face of the documents that he signed. *See id.*, 15 Cal.Rptr. 821, 364 P.2d at 687-88. Indeed, California cases decided after *Lucas* have consistently recognized this limitation and have reiterated the general principle *precluding* liability based on a claim that a properly executed will that was free from legal defects did not accurately express the testator's intent. *See, e.g., Chang v. Lederman*, 172 Cal.App.4th 67, 90 Cal.Rptr.3d 758, 770-71 (2009); *Ventura Cty. Humane Soc'y v. Holloway*, 40 Cal.App.3d 897, 115 Cal.Rptr. 464, 469 (1974). As the court in *Ventura County Humane Society*, 115 Cal.Rptr. at 469, aptly summarized:

> [W]hen ... the testamentary intent has been implemented, no good reason exists why the attorney should be held accountable for using certain words suggested or selected by the testator which later prove to be ambiguous. In addition, the task of proving whether claimed ambiguity was the result of negligence of the drafting attorney or whether it was the deliberate choice of the testator, would impose an insurmountable burden on the parties, since in such a case the trier of fact would be required to decide this crucial issue without the benefit of the testimony of the most important witness, the testa[t]or himself. Once recognized, such a duty would apply by parity of reasoning not only to wills, but also to contracts, conveyances and other legal instruments. The duty thus created would amount to a requirement to draft litigation-proof l[e]gal documents. This unlimited liability ... would result in a speculative and almost intolerable burden on the legal profession indeed.

¶ 41 Here, unlike in *Lucas* and its progeny, Baker and Kunda received precisely what Floyd's will said they should get. Specifically, Floyd's will provided that:

1. If Betty survived Floyd, then she would receive the condominium, and if not, then the property would go to Roosa if she survived Floyd and was living in the condominium at the time of Floyd's death.

2. On Floyd's death, each child would receive a $10,000 bequest, and the residue of his estate would be divided between the family trust and the marital trust.

3. Betty was appointed trustee under both trusts; the trustee was required to pay all of the income from both

trusts to Betty; and the trustee was authorized to pay to Betty "such amounts or all of the principal" of the marital trust as Betty might request, as well as so much of the principal of the family trust as the trustee determined to be required to provide for Betty's reasonable support, maintenance, health, and education.

4. Whatever principal and income remained in the marital trust after Betty's death would be added to the principal of the family trust, and the principal of the family trust would be distributed among the children in equal shares.

¶ 42 On Floyd's death, the children each received a $10,000 bequest, and the marital and testamentary trusts were funded. In addition, it appears undisputed that on Betty's death, Roosa received the condominium, the principal and income remaining in the marital trust was added to the principal of the family trust, and the surviving children received equal distributions of the principal of the family trust—all as Floyd's will expressly envisioned. And although Baker and Kunda suggest that Floyd intended to limit Betty's control over her assets, the substantial control over the marital and family trusts that Floyd's will gave to Betty suggests otherwise.

¶ 43 In these circumstances, we conclude that even if the California Test were the law in Colorado, it would not sanction the malpractice and contract claims that Baker and Kunda seek to pursue against the Attorneys. *See Lucas*, 15 Cal.Rptr. 821, 364 P.2d at 687–88.

### 3. The Florida–Iowa Rule

¶ 44 Baker and Kunda further urge us to adopt the Florida–Iowa Rule, which would extend the third-party beneficiary theory of contract liability to allow them to bring what is effectively a malpractice claim against the Attorneys. Again, we are unpersuaded.

■ ¶ 45 Colorado law recognizes that a person not a party to an express contract may bring an action on the contract if the parties to the agreement intended to benefit the non-party, provided that the benefit claimed is a direct and not merely incidental benefit of the contract. *See, e.g., E.B. Roberts Constr. Co. v. Concrete Contractors, Inc.*, 704 P.2d 859, 865 (Colo.1985).

■ ¶ 46 As Baker and Kunda note, some jurisdictions have adopted the Florida–Iowa Rule and have extended the third-party beneficiary theory of contract liability to allow estate beneficiaries to sue a testator's attorney for professional negligence. *See, e.g., Leak–Gilbert v. Fahle*, 55 P.3d 1054, 1062 (Okla.2002); *Fabian v. Lindsay*, 410 S.C. 475, 765 S.E.2d 132, 141 (2014). These jurisdictions have justified such an extension on the ground that the beneficiaries are purportedly third-party beneficiaries of the contract between the testator and his or her estate planning attorney. *See, e.g., Leak–Gilbert*, 55 P.3d at 1062; *Fabian*, 765 S.E.2d at 141. Under this theory,

[a]n attorney preparing a will has a duty not only to the testator-client, but also to the testator's intended beneficiaries, who may maintain a legal malpractice action against the attorney on theories of either tort (negligence) or contract (as third-party beneficiaries). However, liability to the testamentary beneficiary can arise only if, due to the attorney's professional negligence, the testamentary intent, *as expressed in the will*, is frustrated, and the beneficiary's legacy is lost or diminished as a direct result of that negligence.

*DeMaris v. Asti*, 426 So.2d 1153, 1154 (Fla. Dist.Ct.App.1983) (citation omitted); *see also Schreiner v. Scoville*, 410 N.W.2d 679, 683 (Iowa 1987) ("[W]e hold a cause of action ordinarily will arise only when as a direct result of the lawyer's professional negligence the testator's intent as expressed in the testamentary instruments is frustrated in whole or in part and the beneficiary's interest in the estate is either lost, diminished, or unrealized.").

¶ 47 Explaining the basis for extending the third-party beneficiary theory of contract liability to legal malpractice claims by intended beneficiaries of a will, the Iowa Supreme Court explained that a lawyer is subject to a malpractice suit in these circumstances because he or she "owes a duty of care to the

direct, intended, and specifically identifiable beneficiaries of the testator as expressed in the testator's testamentary instruments." *Schreiner,* 410 N.W.2d at 682.

¶ 48 For the reasons discussed above in connection with our refusal to adopt the California Test, we likewise decline to adopt the Florida–Iowa Rule. Specifically, such a rule is contrary to each of the settled policies underlying the strict privity rule to which Colorado courts have long adhered, and we perceive no justifiable policy reason for so extending attorney liability. This is particularly true given the common law and statutory remedies already available to disappointed beneficiaries (e.g., claims involving fraud, malicious conduct, or negligent misrepresentation and claims for reformation of a governing instrument).

¶ 49 Even if the Florida–Iowa Rule were the law in this state, however, for much the same reasons that the California Test would not save Baker and Kunda's claims, the Florida–Iowa Rule would not do so. Specifically, as noted above, the Florida–Iowa Rule requires that the testator's intent be expressed in the will itself. *See DeMaris,* 426 So.2d at 1154; *Schreiner,* 410 N.W.2d at 683. Thus, courts that have adopted the Florida–Iowa Rule have refused to allow actions claiming that the lawyer failed to follow the testator's directions when the action was based on the testimony of disappointed beneficiaries seeking to prove, through evidence extrinsic to the will, that the testator's intent was other than what was expressed in the will. *See, e.g., Mieras v. DeBona,* 452 Mich. 278, 550 N.W.2d 202, 208 (1996); *Calvert v. Scharf,* 217 W.Va. 684, 619 S.E.2d 197, 208 (2005). As the Iowa Supreme Court stated in *Schreiner,* 410 N.W.2d at 683:

> If the testator's intent, as expressed in the testamentary instruments, is fully implemented, no further challenge will be allowed. Thus, a beneficiary who is simply disappointed with what he or she received from the estate will have no cause of action against the testator's lawyer. This limitation ... protects the integrity and solemnity of an individual's testamentary instruments as well as the testator's express intent....

¶ 50 Here, as noted above, Baker and Kunda received precisely what Floyd's will said they would receive. Accordingly, even if the Florida–Iowa Rule were the law in this state, Baker and Kunda's malpractice and contract claims would still fail because (1) those claims would amount to an action by disappointed beneficiaries seeking to prove, through evidence extrinsic to the will at issue, that the testator's intent was other than what the will said; and (2) those courts that have adopted the Florida–Iowa Rule have refused to extend the rule to recognize such claims. *See, e.g., DeMaris,* 426 So.2d at 1154; *Schreiner,* 410 N.W.2d at 683; *Mieras,* 550 N.W.2d at 208; *Calvert,* 619 S.E.2d at 208.

### 4. Baker and Kunda's Remaining Policy Arguments

¶ 51 Baker and Kunda contend that because the interests of a testator and his or her beneficiaries are identical, there is no adversarial relationship between them, and thus, allowing the beneficiaries to sue the testator's attorney would neither affect the attorney's duty of loyalty to the testator nor create conflicts of interest. They further argue that allowing only third-party beneficiaries to sue would sufficiently limit the potential class of non-clients who can sue an attorney. We do not agree.

¶ 52 As noted above, in a number of situations, an attorney's loyalties can be divided between the goals of the testator/client and the beneficiary. *See, e.g., Noble,* 709 A.2d at 1270; *Barcelo,* 923 S.W.2d at 578. Moreover, we are not persuaded that allowing only third-party beneficiaries to sue would sufficiently limit the potential class of non-clients who could sue an attorney. To the contrary, under the theory that Baker and Kunda espouse, an unlimited and unforeseeable number of people could appear after a testator's death and file lawsuits claiming that they were intended beneficiaries of the testator's will or other instrument disposing of the testator's property. And even if this were not the case, allowing such causes of action would still contradict the other settled policies discussed above favoring privity as a prerequisite to attorney liability to non-clients.

¶ 53 Baker and Kunda further assert that only injured beneficiaries could effectively bring claims such as those at issue because (1) the personal representative would likely have no motivation to bring the claim (because, often, the personal representative allegedly will have received the benefit of the attorney's negligence); and (2) aside from the fees paid to the attorney, the estate has not been damaged, as long as the assets flow into the estate. Again, we are not persuaded.

¶ 54 As noted above, the Colorado Probate Code provides an appropriate vehicle by which disappointed beneficiaries can seek to effectuate what they believe to be a testator's true intent, namely, a reformation action. *See* § 15–11–806 (giving a court the authority to reform the terms of a governing instrument, even if unambiguous, to conform the terms to the transferor's intention). Moreover, the personal representative also has standing to bring claims on behalf of the testator, *see* § 15–12–703(4), C.R.S. (2015), and we are not convinced by Baker and Kunda's suggestion that a personal representative would decline to pursue a legitimate claim on behalf of a testator when the personal representative believes that the testator's intent is being subverted.

### B. Fraudulent Concealment

¶ 55 Baker and Kunda next allege that the division of the court of appeals erred in (1) treating their fraudulent concealment claims as if they were based on overt misrepresentations and (2) improperly applying the C.R.C.P. 9(b) heightened pleading standard to such claims. We perceive no reversible error.

¶ 56 C.R.C.P. 9(b) provides, in pertinent part, "In *all* averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." (Emphasis added.) Baker and Kunda cite no case, and we are aware of none, that excepts fraudulent concealment claims from this requirement. To the contrary, Colorado courts have consistently required all claims sounding in fraud to be pleaded with particularity. *See, e.g., Wiley v. Byrd*, 158 Colo. 479, 408 P.2d 72, 74 (1965) (noting that fraud "may of

course manifest itself in a multitude of forms" and that "fraud must be pleaded with considerable particularity"); *State Farm Mut. Auto. Ins. Co. v. Parrish*, 899 P.2d 285, 289 (Colo.App.1994) (noting that claims "sounding in fraud" must be pleaded with particularity, regardless of the labels attached to the claims).

¶ 57 Additionally, federal courts have expressly recognized that the pleading standards set forth in Fed.R.Civ.P. 9(b) apply to fraudulent concealment claims. *See, e.g., P.R. v. Zavaras*, 49 Fed.Appx. 836, 840 (10th Cir.2002). Because these pleading standards are substantively identical to those set forth in C.R.C.P. 9(b), we deem the federal cases and authorities interpreting Fed.R.Civ.P. 9(b) to be highly persuasive. *See Leaffer v. Zarlengo*, 44 P.3d 1072, 1080–81 (Colo.2002) (noting that federal cases interpreting virtually identical rules "provide helpful and highly persuasive guidance" in interpreting Colorado rules).

¶ 58 Accordingly, we conclude that claims for fraudulent concealment must be pleaded with particularity pursuant to C.R.C.P. 9(b).

¶ 59 To state a claim for fraudulent concealment, a plaintiff must allege:

(1) the concealment of a material existing fact that in equity and good conscience should be disclosed; (2) knowledge on the part of the party against whom the claim is asserted that such a fact is being concealed; (3) ignorance of that fact on the part of the one from whom the fact is concealed; (4) the intention that the concealment be acted upon; and (5) action on the concealment resulting in damages.

*First Interstate Bank of Fort Collins, N.A. v. Piper Aircraft Corp.*, 744 P.2d 1197, 1200 (Colo.1987).

¶ 60 Here, Baker and Kunda alleged that the Attorneys concealed from them "numerous material facts that in equity and good conscience should have been disclosed." These purportedly included the facts that:

(a) the majority of Floyd's estate was comprised of assets which, instead of passing to the *Martial [sic] Trust* as was intended

by Floyd, had passed to Betty outright, free of trust; (b) as a consequence, Betty could change her own estate plan and eliminate or reduce the share that Plaintiffs would each receive of the assets which Floyd had intended them to receive, and (c) that Defendants, and Donald Cook in particular, represented Betty in the drafting of her estate plan, which was being designed to foil Floyd's testamentary intent.

¶ 61 Baker and Kunda further alleged that (1) they relied on "the assurances" in Brundin's November 19, 2003 letter and did not conduct further investigations into the funding and administration of Floyd's trusts; and (2) as a direct and proximate result of the Attorneys' fraudulent concealment, they suffered damages.

¶ 62 When reviewing a district court's ruling on a motion to dismiss, we are in the same position as the district court. *See Cherokee Metro. Dist. v. Upper Black Squirrel Creek Designated Ground Water Mgmt. Dist.*, 247 P.3d 567, 573 (Colo.2011). Moreover, because Baker and Kunda's complaint specifically referred to Brundin's letter, we may consider the contents of that letter in reviewing the district court's order. *Yadon v. Lowry*, 126 P.3d 332, 336 (Colo. App.2005). For several reasons, like the division below, we perceive no error in the district court's order dismissing Baker and Kunda's fraudulent concealment claim.

¶ 63 First, Baker and Kunda cite no applicable law, and we are aware of none, to support their conclusory assertion that equity and good conscience required the Attorneys to disclose to them that Floyd had joint tenancy property.

¶ 64 Second, Baker and Kunda's allegations do not establish that the Attorneys intended for Baker and Kunda to act on any purported concealment. To the contrary, Brundin's letter specifically stated, "I represent Betty Baker as the Personal Representative of Mr. Baker's estate only and I cannot represent either of you individually. If you feel you need an attorney to review the Will to become familiar with the positions [sic], I encourage you to do so." In our view, these statements refute any claim of intended reliance.

¶ 65 Third, Baker and Kunda did not allege sufficient facts to show that they acted on the purported concealment to their detriment (i.e., that they acted based on their belief that the facts were other than what they understood them to be and therefore suffered damages). To the contrary, they alleged that they took no action to investigate the administration of Floyd's will or trusts, despite Brundin's express admonition that they discuss the documents with another attorney if they wanted to become more familiar with the documents' terms. Moreover, Baker and Kunda did not allege how they were damaged by any action that they took or did not take as a result of their alleged misunderstanding of the true facts.

¶ 66 Accordingly, we conclude that the division properly affirmed the district court's order dismissing Baker and Kunda's fraudulent concealment claim, and we need not address Baker and Kunda's assertion that the division misconstrued the nature of their fraud claims.

## C. The Attorneys' Remaining Arguments

¶ 67 In light of our foregoing disposition, we need not address the Attorneys' remaining arguments for affirmance, including their contentions that Baker and Kunda's claims were barred by the applicable statutes of limitations.

## III. Conclusion

¶ 68 For these reasons, the judgment of the court of appeals is affirmed.